## UNITED STATES *v.* KANSAS FLOUR MILLS CORPORATION.

No. 45. Argued November 21, 1941.—Decided December 8, 1941.

*Mr. Warner W. Gardner,* with whom *Assistant Solicitor General Fahy, Assistant Attorney General Clark,* and *Messrs. Sewall Key* and *Hubert L. Will* were on the brief, for the United States.

*Messrs. Edgar Shook* and *Phil D. Morelock,* with whom *Mr. Joseph B. Brennan* was on the brief, for respondent.

Mr. Justice Roberts delivered the opinion of the Court.

Between May, 1935, and January 6, 1936, the respondent entered into eight contracts for the sale of flour to the United States. Deliveries were duly made and the contract price was paid.

Each of the eight contracts provided: .

"Prices set forth herein include any Federal tax heretofore imposed by the Congress which is applicable to the material purchased under this contract. If any sales tax, processing tax, adjustment charge or other taxes or charges are imposed or changed by the Congress after the date set for the opening of the bid upon which this contract is based and made applicable directly upon the production, manufacture, or sale of the supplies covered by this contract, and are paid to the Government by the contractor on the articles or supplies herein contracted for, then the prices named in this contract will be increased or decreased accordingly, and any amount due the contractor as a result of such change will be charged to the Government and entered on vouchers (or invoices) as separate items."

Under the terms of the Agricultural Adjustment Act,[1] processing taxes were due, in respect of the flour sold, aggregating $28,419.20.

In 1936, the respondent entered into four contracts for the sale of flour and bran to the United States for a total price of $23,288.11. The commodities were delivered and vouchers for the purchase price tendered to the General Accounting Office. Payment was withheld by the Comptroller General, who notified the respondent that the Government had overpaid it in the sum of $28,419.20.

The respondent had obtained an injunction against the collection of any processing taxes from it and, as a result

[1] U. S. C. Supp. V, Tit. 7, § 609.

of the decision in *United States* v. *Butler*, 297 U. S. 1, paid no processing taxes on the wheat used in the manufacture of flour covered by the 1935 contracts.

The respondent sued in the Court of Claims to recover the purchase price under the four 1936 contracts, and contested the offsets claimed by the Government arising out of the eight 1935 contracts. Judgment was rendered in favor of the respondent for $23,288.11. 92 Ct. Cls. 390. We granted certiorari because of the importance of the question [2] and of the number of pending cases involving the same question. We are of opinion that the respondent was not entitled to recover.

The contracts are to be construed in the light of the relations between the parties at the time they were executed. The Agricultural Adjustment Act did not exempt a vendor to the United States from the processing tax; and a Treasury Regulation required that he pay the tax.[3] The quoted clause shows that this tax was specifically in the minds of the parties, for it was stipulated that it was included in the price bid. The Government stood in a dual relation to the respondent. It became, at the same time, a purchaser at the named price and also a claimant of the processing tax upon the material purchased. The stipulation was evidently made in view of the facts that the purchasing officer could not buy the goods tax-free and that the Government desired that the price to it should be ex-tax. To accomplish this the sale price was *pro tanto* offset by the amount of the tax. Plainly, if the United States had not been thought entitled to collect the tax, the bid price would not have been acceptable. Plainly, also, if the respondent had not been thought

---

[2] *United States* v. *Hagan & Cushing Co.*, 115 F. 2d 849; *Ismert-Hincke Milling Co.* v. *United States*, 90 Ct. Cls. 27; *United States* v. *American Packing & Provision Co.*, 122 F. 2d 445.

[3] Regulations 81, Art. 9, under the Agricultural Adjustment Act.

liable for the tax, the bid price would have been less.[4]  As disclosed by the contracts, the understanding was that the price would have been less by the amount of the tax.  The respondent disputes this, contending that we cannot say how much of the tax it was willing to absorb in order to obtain the contracts; that it may have been making the sales at an actual loss.  But this is not the theory of the contracts.  They provide that if, in future, any existing tax described therein is changed by Congress, the price named in each contract "will be increased or decreased accordingly."  This does not mean, as contended by respondent, that the amount of increase or decrease is an unknown quantity to be made definite and certain by proof.  It means that the amount of any increase in tax shall be added to, and the amount of any decrease subtracted from, the contract price.  This view is strengthened by the provision for separate billing of the increase, if any.

The respondent, however, argues that, under any construction, the Government is not entitled to maintain its set-off, first, because the contracts contain no undertaking by respondent that it will pay the tax, and, secondly, that, even if they do, the stipulation for reduction of price applies only to changes by Congress and excludes relief from the tax by an adjudication that the exaction is unconstitutional.

In support of the first proposition, the respondent relies on numerous decisions holding tax clauses in private contracts not to require adjustment of the contract price as a result of the decision in the *Butler* case, *supra*.[5]  These

---

[4] Compare *United States* v. *Glenn L. Martin Co.*, 308 U. S. 62.

[5] *Moundridge Milling Co.* v. *Cream of Wheat Corp.*, 105 F. 2d 366; *Consolidated Flour Mills* v. *Ph. Orth Co.*, 114 F. 2d 898; *United States* v. *American Packing & Provision Co.*, 122 F. 2d 445; *City Baking Co.* v. *Cascade Milling & Elevator Co.*, 24 F. Supp. 950; *G. S. Johnson*

go on the absence of an express provision respecting the constitutional validity and upon the omission of the parties to bill the tax separately from the purchase price. We think they are inapplicable in the present case since the tax clause here had a purpose different from those in private contracts. As we have said, the purpose here was to deprive either party of the advantage or disadvantage resulting from the incidence of the tax; and, therefore, it was sought to eliminate the effect of the exaction on the contract price.

In the case of private contracts, the vendees purchase for resale and the tax burden assumed is passed on to their customers. The fact that the processor—the vendor—is protected from the payment of the tax by injunction does not reduce the price to the vendee or to purchasers from him. The courts will not permit the unjust enrichment involved in recovery by the vendee of the amount of tax which he has passed on to his customers.[6] In the contracts in question, the Government did not buy for resale. Unless it received the tax it suffered a definite disadvantage.[7] Its purpose, as shown by the contracts, was to balance the tax element in the price

Co. v. N. Sauer Milling Co., 148 Kan. 861 (1938), 84 P. 2d 934; Sparks Milling Co. v. Powell, 283 Ky. 669 (1940), 143 S. W. 2d 75; Crete Mills v. Smith Baking Co., 136 Neb. 448 (1939), 286 N. W. 333.

[6] See the cases cited Note 5. The respondent urges that the unjust enrichment tax imposed by Title III of the Revenue Act of 1936 (49 Stat. 1734) destroys the equity of the Government's case, but if respondent is required to reduce its price by the amount of its unpaid processing tax it will not be subject to the unjust enrichment tax on these transactions. See §§ 501 (b) (2) and 501 (j) (4).

[7] In United States v. American Packing & Provision Co., 122 F. 2d 445, the Government was held entitled to maintain a set-off asserted under conditions like those here involved on the ground that the vendor had received money from the Government which in equity and good conscience it should repay.

paid with the tax collected.[8] The Government, which could not pass on the tax on resale, was thus protected, not against a fall in the market price but against a loss in its tax revenues. In cases of private sales, the processor's injunction against collection of the tax, as held by the cases cited, worked no harm to his vendee. A similar injunction, in the case of Government contracts, would leave the price to the Government at the higher level reflecting the tax and deprive the Government of the reciprocal benefit flowing from collection of the tax.

In its second position, the respondent attempts to meet what has been said as to the inequity of its retaining the full price, when it escapes paying the tax, with the argument that the result is inevitable under the contracts. It refers to the fact that it had already obtained an injunction against the collection of the processing tax when some of the 1935 contracts were made, and asserts that, if the Government desired to provide against a decision that the taxing act was unconstitutional, this could readily have been done by the addition of a single phrase.

As we have said, there is respectable authority for the position that tax clauses in private contracts do not reach a judicial decision of invalidity of the statute. We think, however, these decisions have no application in the present instance. Here, legislation recognizing the decision in *United States* v. *Butler, supra,* and imposing taxes on the enrichment of those who passed on the amount of the tax without having to pay it, may properly be said to have been a change of the tax by Congress within the terms of the contracts.

The decision in the *Butler* case was rendered January 6, 1936. It is true that after that decision a taxpayer's right to an injunction against the collection of the tax

---

[8] Compare *United States* v. *Cowden Mfg. Co.,* 312 U. S. 34, 36–37.

was clear.[9] But, by the Revenue Act of 1936,[10] which became a law June 22, 1936, Congress not only recognized the effect of that decision as doing away with the tax in question but legislated with respect to the consequent rights and remedies of those who had paid the tax and the liability of those who had passed on its burden and escaped payment.

By Title III a tax is laid on the unjust enrichment consequent upon the passing on to customers the burden of unpaid processing taxes. In § 501 (b) (i) (2) and (j) (2), Congress defines the date of termination of the tax as "in the case of a Federal excise tax held invalid by a decision of the Supreme Court, the date of such decision." In Title IV there is a provision relative to floor stock taxes which recognizes the invalidity of the Agricultural Adjustment Act by reënacting the refund provisions of that Act in respect of transactions prior to January 6, 1936, the date of the *Butler* decision. § 601 (a). The title defines a taxable commodity as one on which a processing tax was provided for as of January 5, 1936, the day before the *Butler* decision. § 602 (c) (1).

Title VII makes provision for the refund of processing taxes collected under the Agricultural Adjustment Act and is a recognition by Congress that the taxes were invalid.

Thus, a change in respondent's tax liability has been recognized and confirmed by Congress. Even though this legislative action was a confirmation of or acquiescence in the *Butler* decision, and although its effect may have been merely cumulative, it amounted to a change made by Congress in respondent's liability for the tax, within the meaning of the contracts.

The judgment is

*Reversed.*

---

[9] *Rickert Rice Mills, Inc.* v. *Fontenot*, 297 U. S. 110.

[10] 49 Stat. 1648.